GARY M. RESTAINO
United States Attorney
District of Arizona

DIMITRA H. SAMPSON
Arizona State Bar No. 019133
KEITH VERCAUTEREN
Arizona State Bar No. 013439
LINDSAY L. SHORT
Arizona State Bar No. 034125
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Ste. 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: Dimitra.Sampson@usdoj.gov
Keith.Vercauteren@usdoj.gov
Lindsay.Short@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-21-02714-001-TUC-RM (MSA) |
| Plaintiff, | |
| vs. | **UNITED STATES' SENTENCING MEMORANDUM** |
| Devonte Okeith Mathis, | |
| Defendant. | |

The United States of America, by and through undersigned counsel, hereby provides the Court and counsel its Sentencing Memorandum, respectfully requesting that the Court accept the parties' plea agreement and sentence the defendant to 10 years of imprisonment to be followed by five years of supervised release.

**I.    Facts**

On October 4, 2021, Defendant DEVONTE OKEITH MATHIS (the defendant) and his friend, Darrion Taylor, boarded an Amtrak commuter train in California after spending the weekend together in San Francisco. They were traveling back to their homes in Texas. During the trip, the train made a routine stop at the Amtrak station in Tucson, Arizona. There, a Drug Enforcement Administration (DEA) Task Force, including DEA Agents and

Task Force Officers (TFO) from the Tucson Police Department, conducted a check of the train after obtaining a list of the passengers on board. The DEA Task Force ran criminal history checks on some of the passengers, including the defendant, who was determined to have past criminal history including drug and weapon offenses.[1]

When the TFOs boarded the train, the defendant and Taylor were observed sitting in the same row. Mathis was then observed moving three bags in the overhead compartment to approximately three to four rows away, and then returning to his seat. Knowing disassociation with baggage to be a common trait of drug traffickers, TFO J.C. questioned the defendant. He denied that the bags were his.

Taylor was removed from the train along with his bags by Special Agent S.F. and TFO G.L. Outside the train, TFO P.H. and his canine did not alert to Taylor's bags (because the canine was not trained to alert to marijuana). Taylor was allowed to reboard the train. At or around the same time, Special Agent M.G. was questioning the defendant, who was never removed from the train. The defendant told Special Agent M.G. that he had flown to San Francisco, California for a birthday party, that he was now heading home to Mesquite, Texas, and that he was traveling with his "cousin," known as "Chicago" (Taylor). TFO G.L. then started talking to the defendant after he reboarded the train. TFO J.C. removed the bags associated with the defendant from the train and located bulk marijuana. TFO J.C. notified other agents and TFOs upon locating the bulk marijuana, and Agents M.G. and S.F. re-contacted Taylor on the upper level of the Amtrak train.

As they were exiting down the stairs of the train, Taylor shot Agent M.G. three times: (1) through his arm, which went through his chest, severing his aorta and both lungs, (2) through his lower side/back, bowel, liver, diaphragm, and chest, and (3) graze wound of the abdomen, with shot (1) killing Agent M.G. Taylor shot Agent S.F. three times: (1) in the chest, which went through his lung and out his back, (2) through the corner of his eye that exited his jaw, and (3) through his neck, with the three shots leaving Agent S.F.

---

[1] Because Taylor purchased his train ticket under a false name, "Taylor Guest," law enforcement was not aware of his own criminal history or outstanding warrant.

incapacitated in the stairwell.

TFO P.H., who was handling the canine, entered the train after the shots were fired. At that time, Taylor shot TFO P.H. twice: (1) in his left side exiting through his abdomen, and (2) in his hamstring, exiting through the side of his leg, with both shots injuring him. There was a break in the gunfire and TFO G.L. returned to Mathis and handcuffed him. Mathis was compliant. TFO G.L. continued to watch over Mathis and sat with Agent M.G. as he died.

TFO J.C. responded to Agent S.F., and at one point, Taylor again approached Agent S.F. and appeared to attempt to execute him at close range. However, TFO J.C. fired multiple rounds, causing Taylor to retreat to a lavatory. TFO P.H., after being shot by Taylor, communicated via his radio that he had been shot. Tucson Police Sergeant T.C. responded to the scene, boarded the train, and gave commands to Taylor to surrender. Taylor verbally agreed, but instead, leaned out from the lavatory and shot at Sergeant T.C. Sergeant T.C. returned fire and heard Taylor groan. Sergeant T.C. continued to direct Taylor to show his hands, but Taylor refused. Ultimately, Taylor stopped responding and Sergeant T.C. observed blood and water flow from the lavatory. Taylor ultimately succumbed to his injuries and died on the train. Both Agent S.F. and TFO P.H. were taken to the hospital and ultimately recovered from their injuries, although Special Agent S.F. had part of his lung removed. Special Agent M.G. died at the scene.

The defendant was detained with more than $5,000 in cash located on his person. His bags contained 2.39 kilograms of marijuana, 50 packages of marijuana edibles weighing 3.5 grams each, and other marijuana and cannabis products. Bags associated with Taylor contained a small quantity of packaged marijuana, 20 bottles of tetrahydrocannabinol (THC) wax, 100 THC vape pen refills, and more than 20 packages of edible THC products. Taylor's bags also contained a heat-sealing device and empty plastic packages. The marijuana found in the defendant's bags were in heat-sealed plastic packages consistent with the heat-sealing device and empty plastic packages found in Taylor's bags.

The defendant was read his *Miranda* warnings and interviewed after the incident. He initially lied repeatedly about numerous facts. He first denied knowing Taylor, but ultimately admitted that they were friends and had been traveling together. When confronted about the fact that he had repeatedly denied knowing Taylor, the defendant stated, "I'm a habitual liar," and that he has been this way his whole life. He also stated that he knew Taylor to carry a firearm in the past in Texas, but he denied knowing that Taylor was carrying any firearm on the train. He knew Taylor to be "on the run" for something, but denied knowing the nature of Taylor's criminal history. The defendant also admitted that Taylor had also previously told him that he, Taylor, did not want to go back to jail. The defendant also initially stated that he traveled without any bags or luggage. When confronted about moving bags in the train's overhead compartment, he ultimately admitted that he purchased approximately four pounds of marijuana and some edibles in San Francisco. The defendant denied that he planned to distribute the marijuana, stating, "I smoke a lot."

Despite his statements to the contrary, the defendant knew that Taylor was traveling with guns. He admitted this fact in his plea agreement, and that it was reasonably foreseeable that Taylor would use and carry the two guns during and in relation to the drug trafficking conspiracy. (Doc. 61 at 11.) Further, two associates of the defendant have confirmed the same information. These two individuals had spent the prior weekend with the defendant and Taylor in California (and were introduced to Taylor by the defendant for the first time that weekend). One of these associates confirmed that the defendant had told them that Taylor was on the run and to not ask too many questions about him. This associate also saw that Taylor was carrying a firearm and extended magazine in his bag during the trip. The other associate witnessed a conversation in which Taylor asked the defendant to carry one of his firearms, but the defendant declined out of fear that he could get caught by law enforcement while holding it. The defendant also told the associate that Taylor was on the run for murder. Taylor had, in fact, been arrested in Oakland, California in August 2020 for charges including First Degree Murder, Carrying a Loaded Firearm

with a Prior Felony Conviction, and Felon in Possession of a Firearm, but was released upon posting bail. Investigation has revealed that Taylor is also believed to have committed a double murder in Chicago in August 2021. (Taylor had also posted images of himself holding guns on social media, as well as posts including, "One thing about me I wanna die with the whole world hating me in a bloody shootout where I kill hella people that's tryna kill me[.]").

Despite the defendant's knowledge of Taylor's possession of two firearms and his violent history, the defendant never told law enforcement on the train that Taylor was armed and dangerous. He had numerous opportunities to do so. The defendant and Taylor were physically separated at points, including while Taylor was outside the train at the same time that the defendant was being questioned on the train by Special Agent M.G. This gave the defendant a perfect opportunity to discretely inform law enforcement about Taylor. Had the defendant conveyed even some of his knowledge, three agents may not have been shot that day, including one fatally.

## II. Sentencing Recommendation

The United States agrees with the calculations and recommendation contained in the Presentence Investigation Report (PSR). As to Count 1, Conspiracy to Possess with Intent to Distribute Marijuana, the PSR properly applies the cross-reference to U.S.S.G. §§ 2D1.1(d)(1), 2A1.1, First Degree Murder, because "a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111[.]" The resulting Base Offense Level is 43. As to Count 2, Using and Carrying a Firearm During and in Relation to a Drug Trafficking Crime, and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, Aid and Abet, the guideline sentence is the term of imprisonment required by statute—at least five years, to be served consecutively to the sentence for the drug trafficking crime. U.S.S.G. § 2K2.4(b); 18 U.S.C. § 924(c)(1)(A)(i). After accounting for the Combined Adjusted Offense Level and the reduction for acceptance of responsibility, the Total Offense Level is 40. The defendant is in Criminal History

Category III. The parties' plea agreement stipulates that the total combined sentence shall not exceed 10 years. (Doc. 61 at 5.)

The United States agrees with the PSR that a sentence of 10 years of incarceration, to be followed by five years of supervised release, is warranted in this case. The defendant knew that his friend and fellow drug trafficker, Taylor, was armed, dangerous, and on the run. The defendant had every opportunity to warn law enforcement, including when the two were physically separated with Taylor outside the train. The defendant instead did nothing and lied about whether bags on the train were his own. This lying continued in his post-arrest interview, in which the defendant, a self-described "habitual liar," lied repeatedly about whether he was traveling with any luggage and whether he knew Taylor, before ultimately making some admissions. The United States acknowledges that when the shooting began, the defendant was compliant. However, if the defendant simply shared even some of the information he knew about Taylor, tragedy may have been avoided.

Further, while the present offense is the most serious, this is far from the defendant's first interaction with law enforcement. Despite what he has characterized as a supportive and stable family, the defendant, currently age 24, became involved in criminal activity as young as 12 years old, when he was prosecuted as a juvenile for selling marijuana at school. He then burglarized multiple residences while still a juvenile, including admitting to stealing a gun from one home at age 15. His criminal activity continued when he reached adulthood, including two additional drug convictions, one of which involved methamphetamine; aggravated assault on a victim while using or exhibiting a firearm; and a criminal mischief conviction, all by the time he was 21 years old (in addition to other arrests for which he has not been convicted). Given his own history, the defendant should have been all the more wary of befriending, traveling with, and conducting drug transactions with someone like Taylor. The defendant's own history and characteristics indicate that this was not a one-off incident, but that he poses a risk to the safety of the community given his repeated history of drug use and violence, in addition to his association with other dangerous criminals.

A 10-year sentence would be sufficient, but not greater than necessary, to accomplish the sentencing goals enumerated in 18 U.S.C. § 3553(a). This was an extremely serious offense. The defendant himself did not pull the trigger, but nonetheless, as a result of his own actions—or lack thereof—the lives of numerous victims will never be the same. These victims include three law enforcement officers who were shot, one of whom was killed, and two of whom live with ramifications of their serious injuries. The victims also include the officers' families, and particularly Special Agent M.G.'s widow, daughter, and other family members. The 10-year sentence will also address the need for just punishment, adequate deterrence, and reflect the defendant's history and characteristics, which include multiple troubling convictions as a young man. A term of supervised release (three years and five years, running concurrently) will also assist with the defendant's transition following his time in custody, as well as provide some comfort to the victims in this case that the Court will retain jurisdiction over the defendant upon his release to the community.

## III. Conclusion

For all of these reasons, the United States respectfully requests this Court accept the plea agreement and sentence the defendant to 10 years of imprisonment to be followed by five years of supervised release.

RESPECTFULLY SUBMITTED this 14th day of June, 2023.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/ Dimitra H. Sampson*
DIMITRA H. SAMPSON
KEITH VERCAUTEREN
LINDSAY L. SHORT
Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of June, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant:

Stephanie Meade
Attorney for Defendant

*s/ Keona L. Ross*
U.S. Attorney's Office