LAW OFFICE OF STEPHANIE J. MEADE
STEPHANIE J. MEADE, ATTORNEY
P.O. BOX 35382
TUCSON, AZ 85740-5382
TELEPHONE #: 520-419-0299
FACSIMILE #: 520-297-6003
EMAIL: meadelaw23@aol.com
STATE BAR #: 012525
PCC#: 38088
Attorney for the Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | NO. CR-21-02714-CKJ-MSA |
| | ) | |
| Plaintiff, | ) | Defendant's Motion |
| | ) | Sentencing Memorandum |
| v. | ) | |
| | ) | |
| | ) | |
| Devonte Okeith Mathis, | ) | |
| | ) | |
| Defendant. | ) | |

Defendant, Devonte Mathis comes before this court by and through his attorney undersigned, and pursuant to *Fed. Crim. R. 32, U.S.C.* 18 §3553 (a) (D) & (b)(1), and *United States v. Booker*, 543 U.S. 220 (2005) and provides these points for this Court's consideration.

The PSR calculates Mr. Mathis' Offense Level as 40, Criminal History Category III. Pursuant to his plea, he has an Offense Level 8 for Count 1: Conspiracy to Possess with Intent to Distribute Marijuana 21 U.S.C. § 841(a)(1),

1

21 U.S.C. § 841(b)(1)(D) and 21 U.S.C. § 846, with a five year consecutive sentence for Count 2: Using and Carrying a Firearm During and in Relation to a Drug Trafficking Crime, and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, Aid and Abet, 18 U.S.C. § 924(c)(1)(A).

In his plea agreement, the government and the defendant agreed and stipulated that, for purposes of entering into this plea agreement, the defendant's Base Offense Level will be calculated on the basis that the controlled substance was 3.124 kilograms of marijuana, which is an offense level of 10.  With the reduction of 2 levels for acceptance of responsibility, the adjusted offense level is 8.

The Base Offense Level for 18 U.S.C. § 924(c)(1)(A), USSG §2K2.4, is 5 years consecutive to Count 1, Conspiracy to Possess with Intent to Distribute Marijuana.  The sentencing range for Base Level 8, Criminal History Category III, is 6-12 months.  The plea agreement has a cap of 10 years.

Mr. Mathis moves this Court for a sentence of 6 months for Count 1, followed by the 5-year consecutive sentence for Count 2, for a total sentence of five- and one-half years, followed by supervised release.  Further, he moves this court to grant his request for the RDAP program and a recommendation to the Bureau of Prisons for placement at FCI El Reno in Oklahoma.

This is case is one of heart wrenching tragedy. Law enforcement officers, who were just doing their jobs, were killed and/ or seriously injured, because a man named Darrion Taylor decided to inflict death and destruction upon them rather than face the consequences of his own actions. Darrion Taylor's violent choices also cost him his own life.

Darrion Taylor's awful choices also drastically affected Devonte Mathis, who was left holding the bag for the violence in this tragedy. But for Darrion Taylor's actions, Devonte Mathis most likely would have only been facing a relatively short sentence for Conspiracy to Possess with Intent to Distribute Marijuana. Instead, he is facing up to ten years in prison for not making other decisions in relation to Darrion Taylor's choice to carry guns and use his guns to harm others in the course of committing the marijuana crime.

In considering its sentencing, the court shall impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing – to reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense; to deter criminal conduct; to promote public safety and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2); *United States v. Trujillo*, 713 F.3d 1003, 1008 (9th Cir.2013), *citing Pepper v. United States*, 562 U.S. 467 (2011).

In making its decision the court shall consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the four primary purposes of sentencing, i.e., retribution, deterrence, incapacitation, and rehabilitation; (3) the kinds of sentences available (e.g., whether probation is prohibited or a mandatory minimum term of imprisonment is required by statute); (4) the sentencing range established through application of the sentencing guidelines and the types of sentences available under the guidelines; (5) any relevant "policy statements" promulgated by the Commission; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

Accordingly, the Supreme Court has consistently instructed that "the punishment should fit the offender and not merely the crime," and thus judges should use "the fullest information possible concerning the defendant's life and characteristics" to determine the appropriate sentence. *Trujillo*, 713 F.3d at 1008-

09, *citing Pepper*, 562 U.S. at 487-88, and *quoting Williams v. New York*, 337 U.S. 241, 246-47 (1949).

While this Court must correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 49 (2007), *Rita v. United States, 551 U.S. 338, 356 (2007). United States v. Lorenzo-Santiago* (5th Cir. 2019), it may not treat that range as mandatory or presumptive. *Id.* at 51; *Nelson v. United States*, 555 U.S. 350, 352 (2009).

A.   The Nature and Circumstances of the Offense:

The details as documented in the PSR provide a comprehensive description of the overall facts.   Clearly, Mr. Mathis and Mr. Taylor decided to travel by Amtrak train to transport marijuana from California to Texas. Law enforcement received information that led them to believe the men may be possessing marijuana with intent to distribute it.   Consequently, they conducted an investigation by contacting Mr. Mathis and Mr. Taylor when their train arrived in Tucson.

When the law enforcement searched the train, Mr. Mathis was described by officers as being unarmed and compliant with their commands.   Unfortunately, when they dealt with Mr. Taylor, he responded to that investigation by shooting at them and killing one of the agents while injuring others.

Later that day, when Mr. Mathis was questioned, he gave varying accounts regarding his knowledge of and/or relationship with Mr. Taylor. Eventually, Mr. Mathis learned of Mr. Taylor's death and admitted to his involvement with conspiring to transport the marijuana.

A confidential source, who had met with the pair when they were in San Francisco prior to their trip through Tucson, told law enforcement that Mr. Taylor had a gun and extended magazine. Further, the confidential source indicated that Mr. Mathis was asked by Mr. Taylor to take one of the guns, but that *Mr. Mathis refused.* He would not take possession of a weapon.

Further investigation revealed, *inter alia*, that Mr. Mathis knew Mr. Taylor had guns, that Mr. Taylor was "on the run" and that Taylor previously told Mr. Mathis he did not want to go back to jail. It was this nexus that resulted in his culpability for the 18 U.S.C. § 924(c)(1)(A) count.

To be sure, the fact that Mr. Mathis would not involve himself with guns did not absolve him from responsibility for the 18 U.S.C. § 924(c)(1)(A) count. He now understands that reality and has accepted responsibility for that role by pleading guilty to Count 2.

Although he is being legally held accountable for that offense, Mr. Mathis would like the Court, and the victims, to know that he did not intend any of the

harm that resulted. In fact, in his mind, he took steps to distance himself from involvement with Mr. Taylor's guns. Nevertheless, his beliefs were misplaced, and he is paying a high price as a result.

B.    The History and Characteristics of Mr. Mathis

Mr. Mathis is somewhat of an enigma. In the sentencing letters provided to the Court, his family and friends described him in loving and positive terms. They also described the very large, loving, Christian home in which he was raised.

He is from a family in which his aunts hold a 3 a.m. prayer group daily. They indicated his childhood was filled with support, joy, and community. Mr. Mathis is described by them as quiet and respectful. They shared that he was a talented athlete who played Little League, football and ran track.

Although the PSR indicates that Mr. Mathis associated with gang members, he adamantly denies being in a gang. He was heavily involved in sports. He graduated from high school. Those factors anecdotally weigh against a presumption of actual gang involvement. Nevertheless, Mr. Mathis' family's warm and positive experiences with him contrast with his other documented challenges and experiences.

When Mr. Mathis was only 12 years old, he was arrested for Possession of a

Controlled Substance in a Drug Free Zone and Theft. At 15 and 16 years old, he was arrested for two more theft offenses. He incurred drug convictions as ages 17 and 19. At 20, he was convicted of Aggravated Assault and, at 21, he was convicted of Criminal Mischief.

Perhaps the family members who have shared such positive experiences with Mr. Mathis were unaware of his challenges or criminal history. Or, perhaps, they viewed some of these issues as relatively normal within the family paradigm when compared to the conduct of other family members.

When Mr. Mathis reviewed his draft presentence report, he read that: "On December 21, 2015, a psychological assessment was completed as a result of his involvement in the juvenile justice system. Records indicate *he was diagnosed with conduct disorder and disruptive impulse-control.* [PSR ¶61][emphasis added]. He was shocked to read this information.

Mr. Mathis contends that he neither received any disclosure of those diagnoses nor received any counseling or treatment. According to Mr. Mathis, the only type of counseling that he ever received was some limited drug counseling in juvenile court.

Conduct disorder is a psychiatric syndrome that most commonly occurs in childhood and adolescence. It is characterized by symptoms of aggression toward

people or animals, destruction of property, deceitfulness or theft, and serious violations of rules.[1]   It is a behavioral and emotional disorder. [2] It can have various causes, such as genetic and environmental factors.

Other possible causes of conduct disorder include child abuse, impulsive behavior, low academic achievement, poor parental supervision, callous or unemotional parental attitude, antisocial parents or peers, trauma, poverty, and living in a high- crime neighborhood or attending a school with a high delinquency rate.

According to the PSR, Mr. Mathis' dad and brother both have criminal convictions for, *inter alia*, aggravated robbery.   Also, Mr. Mathis' father uses marijuana. [¶55 PSR].   Thus, within his family paradigm, it may not be mutually exclusive that some family members to express positive experiences with Mr. Mathis while he has documented experiences suggesting otherwise.   Anecdotally,

---

[1] Conduct Disorder: Recognition and Management, MATHIAS LILLIG, MD *Am Fam Physician.* 2018;98(10):584-592

[2] Conduct: Disorder in children and adolescents - NCBI Bookshelf
National Institutes of Health (.gov)
https://www.ncbi.nlm.nih.gov › books › NBK7133

it appears that his conduct disorder may be genetic.   Given his father and brother's records, his family may not have recognized that his conduct disorder was an issue that required attention and treatment. Nevertheless, conduct disorders do not just go away. They require proactive treatment.

Some possible treatments for conduct disorder include psychosocial intervention**,** such as cognitive behavioral therapy, parent management training, multisystemic therapy, and functional family therapy[3]. Medications such as psychostimulants for comorbid attention-deficit/hyperactivity disorder (ADHD) and risperidone for severe aggression may also be helpful[4].   Unfortunately, in Mr. Mathis' case, none of those therapies ever happened.   Therefore, it is likely that this disorder has continued to impact his decision making throughout his life.

In the PSR, the probation officer indicated that Mr. Mathis accepted responsibility for his role in the drug offense, but that he did not express any concern for the victims.   Further, the PSR documented that some believe Mr. Mathis could have stopped Mr. Taylor's actions had he disclosed to law enforcement that Mr. Taylor had guns.

---

[3] Written by WebMD Editorial Contributors
  Medically Reviewed by Smitha Bhandari, MD on August 25, 2022

[4] Conduct Disorder-Psychology Today
  https://www.psychology today.com/us/conditions/conduct-disorder

First, Mr. Mathis took responsibility for his actions. He now understands that he is legally culpable for the gun offense, but he did not have that knowledge at the time of the offense. In his mind, he has been trying to convey that he had no intention of hurting anyone and that he, himself, did nothing to cause Mr. Taylor's behavior. That is distinguishable from a position of not caring about the victims' pain.

Second, placing the responsibility upon Mr. Mathis to disclose to law enforcement that Mr.Taylor possessed guns, so as to avoid a shooting, is misplaced. In an ideal world, that disclosure may have made a difference. But in order for Mr. Mathis to make that choice, he would have to give up his 5th amendment right to remain silent and then implicate himself. In other words, had he volunteered the fact that Mr. Taylor had weapons, he would have been charged with the same crimes for which he is facing prison today.

Third, the idea that Mr. Mathis should have disclosed the gun information to police ignores the fact that so doing could have subjected him to potential injury or death. If Mr. Mathis really thought that Mr. Taylor would engage in a shootout, then he would have feared that he could be shot along with law enforcement officers. There is no accounting for the rationale in the mind of a murderer.

Shrapnel is real. Flying bullets do not discriminate about the victims they kill. If he did not think Mr. Taylor would shoot others but told law enforcement about the guns, he would have been labeled a snitch and likely attacked in prison.

In a study conducted on 802 inmates in a Texas prison, the researchers concluded that snitching comes with serious risks, as it violates a sacred norm among inmates. Snitching can result in violent consequences, such as being beaten, stabbed or even killed[5].

Moreover, Mr. Mathis's ability to subject himself to dangerous circumstances had been previously impacted when he was traumatized by two significant events in 2019 that likely affected his decisions to subject himself to any dangerous circumstances.  First, he was robbed by three men at gunpoint when he was sitting in his car in a parking lot.  Second, he attended a party at which someone turned off the lights and shot into the crowd, murdering his friend who was standing in close proximity to Mr. Mathis.  Given that, it was not likely that he would have had the wherewithal to risk doing anything that could endanger himself.

In this case, Mr. Mathis conspired to possess with the intent to distribute marijuana.  He knew that Mr. Taylor was on the run and armed.  That knowledge

[5] Look Who's Talking: The Snitching Paradox in a Representative Sample of Prisoners, *The British Journal of Criminology*, Volume 61, Issue 4, July 2021, Pages 1145–1167, https://doi.org/10.1093/bjc/azaa103 30 January 2021

did not necessarily translate into a conclusion that Mr. Taylor would murder people. Many suspects on the run carry guns, but most of the time, they do not kill people when they are apprehended. Unfortunately, Mr. Taylor did so in this case.

C. Conclusion

This tragic case has changed the lives of many, including Mr. Mathis. If he could turn back the hands of time and make better choices, he would. At the time of the offense, he had unknowingly been struggling with an undisclosed, untreated, and significant mental health disorder for most of his life. Mr. Mathis started manifesting behaviors that were consistent with his mental health issues when he was as young as 12 years old. The timing and duration of his long drug abuse history suggests that he was self-medicating with street drugs to cope with his disorders. Since Mr. Mathis did not know he had a mental health disorder, he never sought treatment for it. Perhaps if he had received that treatment, he would not have made the choices that brought him before this court.

Nevertheless, he strove to be successful despite his challenges. He had positive interactions with his large and loving family. He was an accomplished

athlete who competed in several sports and graduated from high school. He worked as a mover and delivery driver. It appears that he made many good faith efforts to be a productive member of society, despite his criminal history and mental health challenges.

Mr. Mathis is focusing on successful choices for his future. He plans to complete drug treatment in prison and continue his sobriety once released. He will seek out mental health counseling to address his issues. Also, he plans to get his CDL and become a long-haul truck driver, along with his girlfriend who is currently getting her CDL.

For all the aforementioned reasons, Ms. Mathis asks this court to sentence him to a total combined sentence of five- and one-half years, followed by supervised release.

Also, he asks this court for a recommendation to the Bureau of Prisons for the RDAP program and placement in FCI El Reno facility in Oklahoma, which is near his family and which has the RDAP program.

Respectfully submitted this 15th day of June, 2023.

*Stephanie J. Meade*
ATTORNEY FOR DEFENDANT
DEVONTE MATHIS

Copy of the foregoing electronically provided this date to:

DIMITRA H. SAMPSON
KEITH VERCAUTEREN
LINDSAY L. SHORT

Assistant U.S. Attorneys